UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CORA T. o/b/o C.R.T., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00604-TWP-MPB |
| | ) | |
| NANCY A. BERRYHILL, Acting Commissioner, | ) | |
| for the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY ON JUDICIAL REVIEW

Plaintiff Cora T.[1] requests judicial review of the final decision of the Acting Commissioner of the Social Security Administration (the "SSA"), denying her child's, ("C.R.T.") application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). For the following reasons, the Court **affirms** the decision of the Acting Commissioner.

### I. PROCEDURAL BACKGROUND

On March 31, 2014, an application for SSI was filed alleging a disability onset date beginning in 2009 (when C.R.T. was born). (Filing No. 5-3 at 21.) His application was initially denied on June 19, 2014, (Filing No. 5-5 at 2), and upon reconsideration on November 23, 2014, (Filing No. 5-5 at 11). Administrative Law Judge Tammy Whitaker (the "ALJ") held a hearing on October 31, 2016, at which Cora T. and C.R.T., represented by counsel, appeared and testified. (Filing No. 5-3 at 47-81.) The ALJ issued a decision on January 12, 2017, concluding that C.R.T. was not entitled to receive SSI. (Filing No. 5-3 at 18.) The Appeals Council denied review on

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

January 4, 2018. (Filing No. 5-2 at 2.) On March 1, 2018, Cora T. timely filed this civil action, asking the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to review the final decision of the Acting Commissioner denying C.R.T. benefits. (Filing No. 1.)

## II.    STANDARD OF REVIEW

For claimants under the age of eighteen, a claimant must have a disability as defined by 20 C.F.R. § 416.924. The Act defines child disability as a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). In determining whether a minor claimant is disabled, the Acting Commissioner employs a three-step sequential analysis: (1) if the claimant is engaged in work that qualifies as substantial gainful activity, he is not disabled regardless of his medical condition, age, education, or work experience; (2) if the claimant does not have a medically determinable severe impairment or combination of impairments, he is not disabled; and (3) if the claimant does not have an impairment that meets, medically equals, or functionally equals a Listing or does not meet the twelve-month durational requirement, he is not disabled. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007).

In considering whether a child's impairment functionally equals a listing, the Acting Commissioner determines whether the claimant has an extreme limitation in one of the following domains or a marked limitation in two of the following domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(a); 20 C.F.R. § 416.926a(b)(1); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). In determining whether such limitations exist, the Acting

Commissioner must consider the interactive and cumulative effects of all the impairments regardless of their severity. 20 C.F.R. § 416.926a(a).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the court reviews the ALJ's decision deferentially, the court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. FACTUAL BACKGROUND

C.R.T. was born in June 2009 and was four years of age at the time his application for SSI was filed. (Filing No. 5-6 at 2.) His application was filed because C.R.T. was deaf in his left ear,

([Filing No. 5-7 at 23](#)), though issues with attention and hyperactivity were also noted, ([Filing No. 5-7 at 10-11](#)). He was born premature with toxemia because of his mother's abuse of pain medications and marijuana during pregnancy. ([Filing No. 5-9 at 72](#).) C.R.T. did not have a stable household initially, but was removed from his parents because of continued drug use and his father's incarceration, and was adopted by his grandparents, including Cora T. ([Filing No. 5-9 at 71](#).)[2]

The ALJ followed the three-step sequential evaluation set forth by the SSA in 20 C.F.R. § 416.924(a) and ultimately concluded that C.R.T. was not disabled. ([Filing No. 5-3 at 39](#).) At step one, the ALJ found that C.R.T. had not engaged in substantial gainful activity since the application date, March 31, 2014.[3] ([Filing No. 5-3 at 24](#).) At step two, the ALJ found that he had the following severe impairments: "hearing impairment, status post implant of attract bone anchored hearing aid for deafness in the left ear since birth, and borderline normal hearing in the right ear; Speech Sound Articulation Disorder; borderline intelligence; adjustment disorder with disturbance of conduct; and attention deficit hyperactivity disorder (ADHD) (20 CFR 416.924(c))." ([Filing No. 5-3 at 24](#).) At step three, the ALJ found that he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. ([Filing No. 5-3 at 26](#).) The ALJ also found that C.R.T. did not have an impairment or combination of impairments that functionally equaled the severity of the listings, specifically finding that he had less than a marked limitation in each of the domains, including acquiring and using information and attending and completing tasks. ([Filing No. 5-3 at 26-39](#).)

---

[2] The relevant evidence of record is amply set forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 416.972(a).

## IV. DISCUSSION

Cora T. raises two issues on appeal, that the ALJ erred in finding that C.R.T. (1) did not meet or equal a listing, and (2) did not have marked limitations in his ability to acquire and use information and attend and complete tasks. The Court will consider the issues raised in turn.

### A. Meeting or Equaling a Listing

Cora T. asserts that the ALJ did not provide an adequate explanation of her finding that C.R.T.'s impairments did not meet or equal any listing. (Filing No. 7 at 15.) She contends that there is adequate evidence "to argue that C.R.T. could at least equal Listings 112.02, 112.04, 112.05, or 112.11 for the combination of his impairments, including ADHD, developmental delays, and moderate mental retardation." (Filing No. 7 at 16.) She argues that equivalence is strictly a medical determination and the ALJ failed to get expert assistance in accordance with Social Security Ruling ("SSR") 96-6p, such that the case must be remanded. (Filing No. 7 at 17.) She further contends that the ALJ's failure to utilize a medical expert to interpret testimony and updated medical records resulted in the ALJ "impermissibly playing doctor." (Filing No. 7 at 18.)

The Acting Commissioner responds that the ALJ's determination that no listing was met or equaled was supported by substantial evidence. (Filing No. 11 at 10.) The Acting Commissioner asserts that neither state agency reviewing consultant opined that C.R.T.'s impairments met or medically equaled a listing and the ALJ was entitled to rely on their opinions. (Filing No. 11 at 13-14.) Furthermore, the Acting Commissioner contends that Cora T. did not identify the medical evidence that would have altered their opinions. (Filing No. 11 at 15-16.)

To meet an impairment identified in the listings, a claimant must establish, with objective medical evidence, the precise criteria specified in the listing. *See* 20 C.F.R. § 416.925; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The

applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three). In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if he has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance." *See* 20 C.F.R. § 416.926. In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595–96 (7th Cir. 2003). However, the Seventh Circuit has held that in the absence of a contradictory medical opinion, where there is no evidence to support a listing, the ALJ can rely on the consultant reviewing opinions that no listing is met or equaled, even without articulating such reliance in the decision. *Scheck*, 357 F.3d at 700-01 (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

Cora T. has not identified evidence that supports that any listing is met. While Cora T. focuses on the perceived inadequacy of the ALJ's written explanation, she has not articulated herself how the ALJ's analysis was deficient by identifying specific evidence of record that arguably meets each of the requirements of any of the listings. To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored which met or equaled the criteria. *See, e.g., Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002). The Court has independently reviewed the evidence of record and does not find any colorable argument that any listing was credibly met.

Moreover, the Court finds that the ALJ fulfilled her duty to get expert assistance to resolve the issue of medical equivalence. "Whether a claimant's impairment equals a listing is a medical

6

judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). SSR 96-6p provides that:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.
>
> When an administrative law judge or the Appeals Council finds that an individual[']s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.

SSR 96-6p (S.S.A. July 2, 1996), 1996 WL 374180, at *3. Cora T. likens her case to *Wadsworth v. Astrue*, 2008 WL 2857326, at *7 (S.D. Ind. July 21, 2008), where the appropriate form was not completed and made a part of the record. However, Steven E. Roush, M.D. ("Dr. Roush"), completed the SSA-831 form on November 21, 2014, along with reconsideration of the claim. (Filing No. 5-4 at 11.)

Furthermore, the Court finds that Cora T. has waived any argument that the ALJ was not entitled to rely on Dr. Roush's assessment that no listing was met or equaled because the ALJ failed to submit updated evidence following Dr. Roush's review to further expert scrutiny. Likewise, the Court finds any related argument the ALJ was not entitled to rely on Dr. Roush's assessment because the ALJ impermissibly played doctor in analyzing the updated evidence is also waived. Cora T. notes that the Seventh Circuit has cautioned against the ALJ making "individual judgments on medical documentation." (Filing No. 7 at 18) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (The Seventh Circuit remanded because "the ALJ simply indulged his own lay

view of depression for that of Dr. Shapiro."). Cora T. conclusively asserts that no state agency "reviewer looked at the evidence past November 21, 2014, which would exclude a great number of records." ([Filing No. 7 at 18](#).) However, Cora T. does not identify the evidence of record that post-dated Dr. Roush's review that would have arguably changed the expert's conclusions, much less as to which specific listing, nor does Cora T. identify medical evidence was that was incorrectly interpreted by the ALJ which should have been reviewed by an expert. The analysis is complicated by Seventh Circuit precedent interpreting the regulations and finding "general observations of daily behavior and restrictions that might result from a medical condition," to be distinguishable from medical evidence, such that an ALJ is qualified to interpret "lay descriptions of readily observable, everyday behaviors" contained in school records. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). An argument that is "perfunctory and undeveloped," may be treated as waived. *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018), *reh'g denied* (Dec. 18, 2018) (quoting *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016)).

As in *Scheck*, the Court does not identify any evidence supporting that a listing is met or equaled and there is no opinion of record to rebut the presumption established by Dr. Roush's state agency review that no listing was medically equaled. *See Scheck*, 357 F.3d at 699-701; *see also* SSR 09-1p (S.S.A. Feb. 17, 2009), 2009 WL 396031, at *12 ("While SSR 96-6p requires that an ALJ or the [Appeals Council] must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence, there is no such requirement for decisions of disability based on functional equivalence."). Accordingly, the Court finds that substantial evidence supports the ALJ's determination that no listing was met or medically equaled.

B.   **Functional Equivalence, Acquiring and Using Information**

Cora T. argues that the ALJ failed "to explain why the remained of the findings in the school assessments of cognitive functioning bear no weight," ([Filing No. 7 at 21](#)), and that the "totality of the evidence, contrary to the ALJ's assertion, does support a finding that C.R.T. has a severe intellectual disability and at least marked limitations in acquiring and using information". ([Filing No. 7 at 22](#).)  Cora T. contends that the ALJ relied heavily on a one-time consultative examiner's opinion, rather than the assessments of teachers and professionals that have worked extensively with C.R.T., and that the ALJ presumed "to know better than specialist Dr. Lah," that C.R.T. was diagnosed with alcohol-related neurodevelopmental disorder without sound reasoning that included a mistaken diagnosis of moderate intellectual disability (formerly referred to as moderate mental retardation).  ([Filing No. 7 at 22](#).)

The Acting Commissioner contends that the ALJ appropriately found that C.R.T. had less than marked limitations in acquiring and using information, including a proper analysis of whether Dr. Lah's diagnostic impressions were supported by the entire record, notably containing an individualized educational plan ("IEP") that determined that C.R.T. qualified for special educational services because of a hearing impairment and speech articulation difficulties. ([Filing No. 11 at 17](#).)  The Acting Commissioner notes that the ALJ cited school records showing C.R.T.'s school-related skills and that his "kindergarten teacher opined that he functioned more as a four-year old than five-year[ old], but assessed him as a 'a little behind but not significantly.'" ([Filing No. 11 at 17-18](#) quoting [Filing No. 5-9 at 62](#)).

As noted above, the final determination at Step Three if the claimant does not meet or medically equal a listing is for the ALJ to assess six domains of functional equivalence (including attending acquiring and using information), requiring extreme limitations in one domain or marked

9

limitations in two to establish that a child is disabled. "We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.

    The Court finds that substantial evidence supports the ALJ's determination that C.R.T. had less than marked limitations in acquiring and using information. "In this domain, we consider how well you acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). SSR 09-3p explains that the domain "considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school." SSR 09-3p (S.S.A. Feb. 17, 2009), 2009 WL 396025, at *2. Cora T.'s argument asks the Court to consider the totality of the evidence. However, the Court is precluded from reweighing the evidence, as explained under the standard of review, so long as there is enough evidence that a reasonable fact-finder could reach the ALJ's conclusion. Furthermore, the Seventh Circuit, in describing the structure of the current regulations used to evaluate child claims, has remarked that "the bulk of 20 C.F.R. § 416.926a is devoted to 'general descriptions of each domain' against which a claimant's functioning may be compared; and so when the dust settles, the agency retains substantial discretion . . . ." *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). As in *Keys*, the Court cannot say that the ALJ abused her discretion here. *Id*.

    The ALJ's determination was supported by the overall functional assessment of C.R.T.'s school psychologist, Amy Larrabee. (*See* [Filing No. 5-9 at 69](#)) (identifying Amy Larrabee as a school psychologist contributing to C.R.T.'s IEP assessment). The ALJ noted that a consultative

psychologist, Brittany A. Dale, Ph.D., had reviewed the prior assessments of C.R.T. showing an overall IQ score of 84 on one test, achievement testing showing standard scores in reading and math that were very low, and writing that was at the level of C.R.T.'s cognitive abilities. ([Filing No. 5-3 at 30](#) citing [Filing No. 5-9 at 72](#)). "Notably the school suspected learning disabilities (rather than any intellectual disability) (EX 8F at 2)." *Id*. The ALJ also noted that Dr. Dale had examined and tested C.R.T., finding that his verbal comprehension was extremely low, but that he retained average working memory and processing speed. ([Filing No. 5-3 at 30](#)). "Full scale I.Q. score was 76, which was borderline. Dr. Dale assessed that the claimant's borderline skills were consistent with his adaptive functioning." *Id*. (internal citation omitted, citing [Filing No. 5-9 at 73](#), 75). The ALJ continued to explain that "[i]n this regard, school records noted that the child, as age 5, functioned more as a 4-year-old. The claimant was only assessed as being a little behind, but not significantly (Ex 7F at 13.)" ([Filing No. 5-3 at 30](#)). That was the functional assessment that Dr. Larrabee provided at the end of her IEP testing. (*See* [Filing No. 5-9 at 62](#) (C.R.T.'s cognitive ability was tested and found to be higher than expected. "After beginning the testing Dr. Larrabee found some great strength in some areas for [C.R.T.] that change her route a little more toward the Other Health Impairment (OHI) area for his eligibility." He was found to be a "very good visual learner.")). While the testing performed by Dr. Dale and Dr. Larrabee identified significant problems, most notably related to C.R.T.'s hearing and related abilities to comprehend speech, his overall intelligence, cognitive abilities, and relative strengths allowed him to stay within a year of his expected functioning level, and plans were made to tailor his education towards his strengths. The Court does not find fault with the ALJ focusing her analysis on the functional bottom-line provided by Dr. Dale and Dr. Larrabee's assessments when faced with the difficult task of weighing the conflicting and variable evidence in the record.

As presented by Cora T., the Court is aware that the Seventh Circuit has remanded, at least in part, because of an ALJ's failure to confront portions of the school records in assessing a child claim, as well as for not giving any apparent consideration to the fact indications of academic achievement were in the context of significant special education accommodations. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699-700 (7th Cir. 2009). To a limited extent, the Court agrees that the ALJ succumbed to some of the same issues, commenting that C.R.T. received As and Bs and had "no trouble with class assignments or homework," which is of limited significance considering the substantial special education accommodations he receives. (Filing No. 5-3 at 30.) The ALJ also did not analyze portions of the IEP materials, which are relevant to an assessment of C.R.T.'s ability to acquire and use information:

> Assessment of [C.R.T.'s] achievement functioning indicated his reading, written language and mathematic skills were lower than expected given his age. Reading and mathematics skills were especially undeveloped given extensive intervention received. Assessment of adaptive behavior skills varied according to rater. [C.R.T.'s] teacher indicated his adaptive skills fell within the extremely low range, while [Cora T.] reported low average adaptive behavior functioning consistent with assessment of [C.R.T.'s] intellectual functioning level. Observation of [C.R.T.] within the classroom indicated demonstrated difficulty following directives and completing grade level academic tasks without one-on-one assistance.
>
> Overall, the results of the evaluation indicate [C.R.T.] continues to be eligible for special education services as a student with a Speech Impairment. Additional qualification as student with Other Health Impairment due to diagnosed medical concerns identified at birth (i.e., profound hearing loss, exposure to prenatal teratogens) which impact [C.R.T.'s] academic development is proposed.

(Filing 5-9 at 69); *see* SSR 09-3p, 2009 WL 396025, at *3 ("[o]ther indications in school records that a mental or physical impairment(s) may be interfering with a child's ability to acquire and use information include [. . .] Special education services, [. . .] or placement in a self-contained classroom."). The examples provided in the regulations as corresponding to using and acquiring information explain for preschool children ages three to six:

> When you are old enough to go to preschool or kindergarten, you should begin to learn and use the skills that will help you to read and write and do arithmetic when you are older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write. Using words to ask questions, describe things, explain what you mean, and tell stories allow you to acquire and share knowledge and experience of the world around you. All of these skills are called "readiness skills," and you should have them by the time you begin first grade.

20 C.F.R. § 416.926a(g)(2)(iii). However, the ALJ is not required to evaluate every piece of evidence and the Court does not find error here because the Court is able to trace the ALJ's logic from the analysis she provided. As already explained, despite indications of significant problems in certain areas, C.R.T. has relative strengths that have allowed him to remain behind, but not significantly so overall.

The ALJ did analyze C.R.T.'s readiness skills. For one, the ALJ noted that Dr. Dale has reviewed the IEP materials, including achievement testing showing very low math and reading skills. ([Filing No. 5-3 at 30](#).) She also noted relevant evidence in the IEP testing and Dr. Dale's consultative testing:

> At the same time, school records show that the claimant could name the letter C. He was able to sequence items, match letters and objects, point to items in a book, and match cause and effect pictures. He could name 8 out of 10 basic colors, and 4 out of 8 basic shapes. He could count to 10 with 90 percent accuracy (EX 7F at 3, 5). Dr. Dale, a consultative psychologist, noted that the claimant answered 4 of 6 questions related to fund of information. In receptive language testing, he could point to 5 objects. In calculations, he could identify 1 of 2 numbers. He could not add *2+2*. He could repeat the alphabet in 20 seconds. He solved 3 of 3 simple riddles (EX 8F at 4).

([Filing No. 5-3 at 30](#).) When reviewing the evidence related to C.R.T.'s ability to manipulate objects, the ALJ noted that he "was able to write his first name with 75 percent accuracy. He could trace and copy some letters and numbers. He could use scissors and glue." ([Filing No. 5-3 at 35](#)); *see Rice*, 384 F.3d at 370 n.5 ("it is proper to read the ALJ's decision as a whole, and . . . it would

be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision). The question before the ALJ was not whether there were indications that C.R.T. functioned behind his peers, but to what degree? Under the standard of review, the Court does not analyze whether it agrees with how the ALJ weighed the evidence, but instead analyzes whether the ALJ's conclusions were reasonable. The Court cannot conclude in this case, given the relevant evidence that was analyzed by the ALJ and the functional assessments of Dr. Dale and Dr. Larrabee, that the ALJ's conclusion that C.R.T. had less than a marked degree of limitation in using and acquiring information was unreasonable.

C. **Functional Equivalence, Attending and Completing Tasks**

Cora T. also takes issue with the ALJ assigning a less than marked level of limitation with another functional equivalence domain, attending and completing tasks. ([Filing No. 7 at 22-24](#).) "In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h).

Observing, as noted above, that the regulations require marked limitations in two domains or extreme limitations in one domain, the Court need not provide an extensive analysis of this domain. The Court finds that substantial evidence supports the ALJ's determination, once again under the deferential standard of review. Cora T. admits that the ALJ acknowledged that several sources, including Dr. Lah, Dr. Dale, and C.R.T.'s kindergarten teacher had reported C.R.T.'s "difficulties with attention, impulsiveness, memory, and distraction." ([Filing No. 7 at 22](#).) However, Cora T. points out that there are other indications in the record of difficulties in this domain and asserts that the ALJ did not provide a logical bridge from the evidence to her conclusion. ([Filing No. 7 at 23](#)) (many of the citations provided by Cora T. are simply indications

14

in the record that she has reported C.R.T. having problems with hyperactivity and attention.). The Court does not agree that a logical bridge is lacking.

The ALJ had already explained early in the decision that C.R.T.'s "behavior was much improved with medication." (Filing No. 5-3 at 26.) On January 12, 2016, C.R.T.'s therapist noted that his strengths included being "very attentive," while his weaknesses included not being able to manage transitions well at school, and had the following to say about his progress:

> [Client] is able to participate in everything at school without many incidents. [Client] has cut back on his aggression to his sister at home. [Client] is developing his speech more rapidly now. [Client] does well with a reward system. [Client] is very independent and likes to figure out things himself. Grandparents (legal guardians) do not wish at this time to have [client] on any medications as they are not comfortable with it just yet.

(Filing No. 5-11 at 27.) On April 22, 2016, C.R.T.'s treating provider diagnosed him with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed Methylphenidate.[4] (Filing No. 5-11 at 4-5.) On April 26, 2016, Adderall was also prescribed. (Filing No. 5-11 at 3.) On June 14, 2016, treatment notes indicated that C.R.T.'s behavior was "much better" and that "Adderall is helping a lot." (Filing No. 5-13 at 5.) A mental condition that is treatable and under control is not a basis for disability benefits. *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

The ALJ also explained that C.R.T. was "distractible and hyperactive, but this did not substantially limit his function, and he was able to sustain attention and persistence during a consultative examination." (Filing No. 5-3 at 26.) The consultative examination report included the following observations of Dr. Dale:

> He was very active during the interview and explored the room. During testing, he often stood at his seat to complete items. He stood very close to the examiner at

---

[4] Methylphenidate is the generic form of a central nervous system stimulant used to treat ADHD, which is also offered by various name brands, including Ritalin. Drugs.com, https://www.drugs.com/methylphenidate.html (last visited Jan. 29, 2019).

15

times. His articulation skills were poor, but overall language skills appeared intact. Despite his hyperactivity, his level of attention was adequate for testing. Task persistence was good, and he often asked what task was next after the completion of a subtest.

(Filing No. 5-9 at 72.) Furthermore, the ALJ noted that "upon personal observation at the hearing, the undersigned notes that the claimant did have trouble sitting still. However, he was able to stay in his chair and answer questions appropriately." (Filing No. 5-3 at 32.) The Court has less freedom to review the subjective observations of the ALJ, including the demeanor of the claimant. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Accordingly, the Court finds that the ALJ provided a sufficient explanation as to how the evidence supported her conclusion that C.R.T. had less than marked limitation in attending and completing tasks. The Court does not find any basis to disturb the ALJ's functional equivalence determination within the framework of the standard of review.

## V. CONCLUSION

For the reasons stated above, the Court finds no legal basis to reverse the ALJ's decision. The final decision of the Acting Commissioner is **AFFIRMED**. Cora T.'s appeal is **DISMISSED**.

**SO ORDERED.**

Date: 3/14/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

Christie O'Brien Tate
SOCIAL SECURITY ADMINISTRATION
christie.tate@ssa.gov